In the

# United States Court of Appeals

### For the Seventh Circuit

Nos. 11-3477, 11-3570 & 12-1334

LOCK REALTY CORP. IX,

*Plaintiff-Appellee/*
*Cross-Appellant*,

*v.*

U.S. HEALTH, LP, *et al.*,

*Defendants-Appellants/*
*Cross-Appellees.*

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
Nos. 3:06-CV-487 RM, 3:05-CV-715 RM—**Robert L. Miller, Jr.**, *Judge.*

ARGUED SEPTEMBER 17, 2012—DECIDED FEBRUARY 12, 2013

Before EASTERBROOK, *Chief Judge,* and BAUER and WOOD, *Circuit Judges.*

WOOD, *Circuit Judge.* These appeals represent the end of the line for a long-running dispute over a nursing-home lease between Lock Realty Corporation IX (the lessor) and U.S. Health (the lessee) and Americare (the lessee's assignee). For simplicity, we refer to the

defendants as Americare unless the context requires otherwise. Between Americare's appeal and Lock's cross-appeal, we are presented with a potpourri of issues covering everything from the propriety of a partial summary judgment in Lock's favor to the district court's attorneys' fee decision. The most complex question, however, relates to our appellate jurisdiction—a subject on which we requested supplemental briefing after oral argument. After reviewing the parties' submissions, we are satisfied that our jurisdiction is secure. On the merits, we find no reversible error in the various rulings of the district court that the parties have highlighted, and so we affirm.

## I

In January 2002, U.S. Health entered into a 20-year lease for a nursing home and adjacent property owned by Lock in Goshen, Indiana. Defendants Larry New, John Bartle, and Rebecca Bartle guaranteed the lease, which was to run from April 2002 to March 2022. At some point before mid-2006, U.S. Health assigned the lease to defendant Americare Living Centers III, LLC. It did so without obtaining Lock's written consent, despite a provision in the lease imposing that precondition to assignment. Other concerns began to come to light, however, that did attract Lock's attention. Two separate lawsuits followed, to which we will refer as *Lock I* and *Lock II*. We trace each one here, in the hope that this detail will not only place the issues before us in context, but will also show why we have appellate jurisdiction.

For the most part, facts relating to the merits of the arguments on appeal will be presented as we discuss each point.

## A. *Lock I*

On January 24, 2006, Lock filed suit in federal court, invoking the diversity jurisdiction, against U.S. Health. This lawsuit, No. 3:05-CV-715 in the district court, charged that U.S. Health had violated a provision of the lease under which it was required to fund a replacement reserve. The parties reached a settlement relatively quickly. On May 4, 2006, the district court entered an order for a stipulated judgment in Lock's favor of $679,287.96, along with prejudgment interest of $1,471.13; it set the interest rate for the post-judgment period at 4.94%. The next day, U.S. Health filed a motion to set aside the May 4 judgment. On May 17, 2006, the parties stipulated that the judgment would be set aside and a new judgment for Lock in the amount of $485,430.56 would be entered. The stipulation also noted that an amount for attorneys' fees would be agreed by June 10, 2006, and a supplemental judgment reflecting that agreement would be entered. On May 30, 2006, the court entered an order reflecting the May 17 stipulations.

Although things had been going smoothly (more or less) up to that point, it was not long before problems began to crop up. The June 10 date for an agreement on attorneys' fees turned out to be unrealistic, and so there were several extensions. On June 21, 2006, however, the

court entered a final judgment for Lock in the agreed amount of $485,430.56, plus post-judgment interest at a rate of 5.13%. On July 14, 2006, the court issued an order granting Lock's motion for fees and setting the amount at $29,238.85. Six weeks later, on August 31, 2006, Lock filed a motion under Federal Rule of Civil Procedure 60(b)(2) and (3) asking the court to modify its judgment to include Americare as a judgment debtor. Lock explained that it had only then learned that U.S. Health, without the necessary authorization from Lock, had assigned its lease to Americare. The court obliged in an order entered September 25, 2006.

On October 5, Americare filed a motion under Federal Rule of Civil Procedure 59(e) to amend the September 25 order by removing it as a judgment debtor. The court denied this motion on November 28, 2006; this appears to be its last word on the appropriateness of including Americare in the case.

In the meantime, Lock was having no luck collecting its half-million dollars from either U.S. Health or Americare. On January 16, 2007, Lock filed a motion for supplemental attorneys' fees and costs arising out of its collection efforts. The court denied that motion on February 27, 2007. At the same time, it resolved some motions that raised issues about priority among the parties for certain Medicare funds, which apparently were being sought in connection with the judgment. It set a hearing on that issue for March 7, and on March 9, it entered an order disbursing the Medicare funds that it previously had frozen. This order stated that the

June 21 judgment on the merits and the July 14 attorneys' fee judgments were satisfied. This came tantalizingly close to resolving the case, but one matter remained outstanding: Lock's effort to obtain additional fees and costs related to the post-judgment phase.

On March 16, 2007, Lock decided to pursue that matter in a different way, by filing a motion to amend the July 14, 2006, judgment for attorneys' fees. Although it is not clear, this motion seems to have relied on Rule 60(b)(3), which permits relief from a final judgment for reasons of fraud, misrepresentation, or misconduct by an opposing party. The court denied that motion more than a year later, on April 28, 2008, but it did so "without prejudice to its renewal at the conclusion of the companion case [*Lock II*], at which time Lock may submit evidentiary support for the attorneys' fees and costs requested." More than two years after that order, on July 22, 2010, the court entered its final judgment in *Lock II,* as we describe below. Lock followed up with a renewed motion for supplemental attorneys' fees, as the court had said it could, on August 5, 2010. Another year and a half elapsed before that motion was resolved, but on January 10, 2012, the court issued an order granting Lock an additional $86,675.50 in fees and $1,206.02 in costs. In the same order, the court denied Americare's motion to strike the affidavit of Timothy Maher, Lock's lead counsel, in support of the fee motion. With all of the loose ends finally tied up, Americare and U.S. Health filed their notice of appeal on February 9, 2012, from the January 10 award of fees. That appeal was docketed as No. 12-1334 in this court.

### B. *Lock II*

As we noted above, shortly after the district court entered its judgment in June 2006 in Lock's favor and Lock began its collection efforts, Lock learned about U.S. Health's assignment of the lease to Americare. In addition, Lock had not received the rental payments on the lease for the months of June, July, and August 2006, and Lock believed that U.S. Health had breached the guarantees in the lease. In September 2006, therefore, Lock filed suit against U.S. Health, Americare, and the individual defendants for breach of contract and for immediate possession of the premises. This case was assigned No. 3:06-CV-487 in the district court. Within a few days, the district court granted Lock's motion for immediate possession.

The focus of the case then shifted to the damages question. On February 6, 2007, the court denied Lock's motion for damages in the amount of $10,291,817.73, which allegedly represented the future rent under the lease. Instead, the court ruled, damages had to be calculated by offsetting the fair rental value of the property against the future rents owed under the lease. Lock also filed a motion seeking from the defendants the $371,249.30 that represented the missed rental payments for June through September 2006. U.S. Health and Americare responded—five months late, the court thought—and asserted that this amount should be reduced by the value of the assets and consumables that Lock acquired when it took over the nursing home.

On March 25, 2008, the court granted Lock's motion for partial summary judgment for the delinquent rents

in the full requested amount of $371,249.30. The court explained that it was denying Americare's setoff defense because it had been waived by the tardy filing. This left the question of the remaining damages for the breach of the lease on the table.

Matters lay quiet for a long time, but on September 14, 2009, the district court filed an order addressing a number of matters that had accumulated. In that order, it rejected the methodology for calculating the fair rental value of the property that had been proposed by Lock's expert, Jean Tipton, as unreliable under Federal Rule of Evidence 702. It criticized Tipton for relying on two rejected offers from U.S. Health to pay lower rent and for failing to use any of the three conventionally accepted methods for property valuation. Next, the court denied as untimely Lock's motion to introduce evidence of audit rates to supplement its showing of fair rental value; Lock had filed the motion in October 2008, long after the discovery cutoff of April 2008. The court also denied Lock's motion for summary judgment in the amount of $6,092,153, because there was no support for this figure once Tipton's testimony was excluded. Finally, the court granted Americare's motion to limit Lock to its liquidated damages, because Lock had the burden of proof on damages and it had failed to submit any admissible evidence.

After another long hiatus, on January 13, 2010, the district court denied Lock's motion to reconsider the September 14, 2009, order. The spring of 2010 was apparently consumed by trial preparation: on July 20, 2010,

after a one-day bench trial, the court reconsidered its earlier ruling on Americare's motion and found that Americare was entitled to a total of $126,366.71 as a setoff from the $371,249.30 in rent that it owed Lock, for a net amount due to Lock of $244,883.13. (The difference seems actually to be $244,882.59, but we will not quibble about less than a dollar.) It also awarded Lock liquidated damages in the amount of $212,703.96 (the security deposit) and $416,328.25 (the escrow account), making the total due to Lock $873,915.34 before prejudgment interest. On July 22, 2010, the court entered a final judgment to this effect, but on August 8, Lock filed a motion under Rule 59(e) asking the court to amend the judgment to include prejudgment interest. On October 3, 2011, the court granted that motion, but only for the past-due rent portion of the judgment ($244,883.13). Along the way, Lock had filed a motion for attorneys' fees; the court also addressed that motion on October 3, 2011. Lock had wanted $804,614.50 in fees, but the court cut that amount back to $696,390.50, and it awarded $4,756.14 in costs. As it had done in *Lock I*, it denied U.S. Health's motion to strike the affidavit of Maher, Lock's lawyer.

With the case at last over, on November 1, 2011, Lock filed its notice of appeal, in which it identified the September 14, 2009, order rejecting its estimates of damages, and the January 13, 2010, order denying reconsideration of the same ruling. That appeal is No. 11-3477 in this court. On November 14, 2011, U.S. Health and Americare filed a cross-appeal from the district court's decision of September 29, 2007, denying their motion to dismiss

the amended complaint, the July 22, 2010, judgment in Lock's favor, the October 3, 2011, order refusing to strike Maher's affidavit, and the October 2, 2011, order granting prejudgment interest for Lock. The cross-appeal is No. 11-3570.

## II

The age of many of the critical rulings in these two cases caused us to wonder whether the notices of appeal had been filed within the time permitted by Federal Rule of Appellate Procedure 4(a). At first (and second) glance, the key rulings especially in *Lock I* seem to have taken place more than half a decade ago. Even *Lock II*'s final judgment has aged: it was entered on July 22, 2010. But, as we explain, for differing reasons both appeals are properly here.

*Lock II* is the more straightforward case, and so we begin with that. The district court's final judgment was entered on July 22, 2010; Lock's Rule 59(e) motion was filed on August 8, 2010, well within 28 days after the judgment, and so it had the effect of postponing the time to file the notice of appeal until the district court resolved the motion. See FED. R. APP. P. 4(a)(4)(A)(iv). The court issued its ruling on the Rule 59(e) motion on October 3, 2011, and Lock's notice of appeal was filed on November 1, 2011, 29 days later and thus within the 30 days permitted by Appellate Rule 4(a)(1)(A). A properly filed notice of appeal from a final judgment brings up all earlier rulings in the same case, and so Lock is now entitled to raise its points in No. 11-3477 about the

September 2009 and January 2010 rulings. See *Carver v. Condie,* 169 F.3d 469, 472 (7th Cir. 1999). Finally, for the sake of completeness, we note that U.S. Health and Americare filed their cross-appeal within the 14-day period allowed by Appellate Rule 4(a)(3), and so No. 11-3570 is properly here as well.

The situation in No. 12-1334, the appeal in *Lock I* from the district court's decision to grant additional attorneys' fees to Lock, is somewhat more complicated. At root, it arises out of Lock's March 16, 2007, motion under Rule 60(b); more broadly, it is important to remember that this part of the case arises out of post-judgment collection efforts. See generally Charles Alan Wright *et al.,* 15B FEDERAL PRACTICE AND PROCEDURE § 3916 (2d ed. 1992). In such circumstances, "we try to treat the postjudgment proceeding as if it were a free-standing lawsuit." *Bogard v. Wright,* 159 F.3d 1060, 1062 (7th Cir. 1998). The only question in this appeal concerns the disposition of Lock's post-judgment motions to collect attorneys' fees related to its collection efforts. Lock renewed that motion on August 5, 2010, and on January 10, 2012, the court granted Lock's motion by awarding it an additional $86,675.50 in fees and $1,106.02 in costs and denying U.S. Health and Americare's motion to strike Maher's affidavit. On February 9, exactly 30 days after that order, U.S. Health and Americare filed their notice of appeal from the January 10 order. This too complied with Appellate Rule 4(a)(1)(A). We are therefore free to proceed to the merits of U.S. Health and Americare's appeal and cross-appeal, and Lock's appeal.

**III**

Although it is plain that this litigation has endured for far too long, by this time issues have boiled down to a relatively manageable number. We see no further value in identifying which of two cases or which appeal corresponds to each dispute, and so the remainder of our discussion assumes that we have essentially one over-arching controversy. Lock has presented three matters for our consideration: (1) whether the district court abused its discretion when it struck Tipton's expert opinion, denied Lock's motion to strike the opinions of Greg Jurgonski and Bonnie Mitchell, and denied Lock's motion to supplement its evidence of future damages; (2) whether on the record that existed, Lock showed that there were no genuine issues of material fact on its claim for future rent damages, and thus was entitled to summary judgment on that point; and (3) whether the district court abused its discretion by allowing Americare to assert its setoff defense and by refusing to allow Lock to conduct discovery on that issue. For its part, Americare (1) attacks the district court's decision to permit Maher's affidavit to be used in support of attorneys' fees in both *Lock I* and *Lock II,* and (2) argues that the district court erred both in awarding fees to Lock and in refusing to adjust the amount of fees to reflect Americare's success on its setoff argument. We address these five points in turn.

**A**

District courts enjoy considerable discretion in evaluating the qualifications of an expert and the reli-

ability of the proffered testimony. *Ortiz v. City of Chicago,* 656 F.3d 523, 536 (7th Cir. 2011). In this case, the court stated that it agreed with the defendants that the lease itself required the following three-step damages calculation:

> (1) the remaining net rent must be calculated by an expert qualified to testify on the consumer price index and present discount values; (2) an expert qualified to testify as to the lease's fair market value for the period of net rent must be determined; (3) the second number must be deducted from the first to determine whether any damages were sustained.

With respect to the second step, the court observed that three valuation methods are generally used to determine the fair market value of real property, and each has its analog for rental property. Those methods, it continued, are (1) the comparable sales method, (2) the income method, and (3) the cost method. See, *e.g., State v. Bishop,* 800 N.E.2d 918, 923-24 (Ind. 2003) (describing these three methods as widely used in eminent domain cases); *Scott-Reitz Ltd. v. Rein Warsaw Assoc.,* 658 N.E.2d 98, 105 (Ind. Ct. App. 1995) ("All three have been approved by this Court as a method of determining a property's fair market value."). The court indicated that a combination of those three methods might even be appropriate.

Lock proposed to satisfy its burden of proving damages with an expert report from Jean Tipton. The court found that Tipton had satisfactory qualifications based on her

accounting and valuation experience, even though she had no special expertise in the health-care industry. Her methodology for determining the fair market value of the lease, however, was another matter; it did not follow any of the recognized approaches the court had outlined, either separately or in combination. Instead, Tipton relied on three items of evidence to help her assess the value of the future rent for the Goshen facility. First, she consulted an email from defendant John Bartle offering to renegotiate the lease by reducing the monthly rent to $65,000; second, she took into account an email from American Senior Communities offering to lease the Goshen facility for $500,000 to $600,000 annually; and finally, she applied a formula found in an Indiana statute for use in compensating Medicaid providers in nursing facilities, 405 Ind. Admin. Code 1-14.6-12, to corroborate the first two numbers. She concluded that the reasonable rental value of the facility was $55,000 per month. Based on that information, Tipton determined that the remaining net rent payable (discounted to present value) was $14,937,182, the fair rental value of the property for the remaining period of the lease (again discounted) was $8,845,030, and thus that the damages were $6,092,153. For their part, the Americare defendants introduced valuation opinions from two people: Louis Jackson and Bonnie Mitchell. The district court did not, however, base any part of its decision on either Jackson's or Mitchell's opinion, and so we have no need to speculate whether the reports of either or both would have been admissible.

The court found that Tipton's calculations failed the standard of reliability required by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993); it might also have cited Federal Rule of Evidence 702(c). Tipton did not follow any of the recognized methodologies accepted under Indiana law (and no one argued that a law other than Indiana's should apply in this diversity case). Moreover, there was no evidence indicating that Tipton had found a fourth valid approach. Against this backdrop, the court found that the bases for Tipton's opinion were empirically questionable. Lock had rejected the offers that U.S. Health made in an attempt to reduce the rent, and so those offers proved nothing. Using the Medicaid compensation formula to determine the private rental value was also unsupported. As the court put it, "Tipton does not explain how the Medicaid formula applies in deciding the fair market value for a lease between private companies, nor does she provide figures used to calculate the rate."

With Tipton's evidence gone, Lock was left with nothing else that would permit a jury to find the actual damages it suffered from the breach of the lease. But in October 2008, Lock had moved to submit additional evidence on the fair rental value of the property. It had in mind some Notices of Audit Rates issued by a contractor for the Indiana Family and Social Services Agency. The court recognized that it had discretion to permit supplementary affidavits under Federal Rule of Civil Procedure 56(e), but it declined to exercise that discretion favorably to Lock for the simple reason that

the request came six months after the close of discovery. The court pointed out that the defendants had had no opportunity to depose or serve written discovery on the Agency's representative, nor had they been able to explore the validity of the rates. Even though this motion languished for 11 months before the district court ruled—not something we endorse—we see no abuse of discretion in the substance of the court's ruling.

Lock did, however, prevail to a degree on one remaining point. At the same time as it moved for summary judgment based on Tipton's testimony, Americare responded with a motion for partial summary judgment that would either limit Lock to its liquidated damages or rule as a matter of law that it was entitled to no damages at all. The court took the former option, as we explained in our account of the facts, and that is why Lock was entitled to recover both the security deposit and the escrowed funds in the judgment resolving *Lock II*.

B

Little needs to be said about Lock's argument that the court erred when it refused to grant summary judgment awarding Lock $6,000,000 (or any other number) representing future rental payments. Once the district court rejected Tipton's report and denied Lock's motion to supplement the record, Lock could not satisfy its burden of proof on this issue. There are no additional facts or legal issues that bear on this point. The

only choice the court had, therefore, was to deny Lock's motion.

## C

The setoff question relates to the amount Lock was entitled to recover for the delinquent rental payments for June through September 2006. Lock took the position that it was entitled to the full amount of those payments ($371,249.30), while Americare argued that it should be entitled to set off the value of the assets and consumables that Lock acquired when it took over the nursing home. Initially, the court ruled that Americare could not present its setoff argument, because the court thought that the defense had not been raised in a timely manner and was thus waived. Later, the court reconsidered that order. It recalled that Lock acknowledged Americare's intention to argue for a setoff in one of Lock's own 2006 summary judgment filings. Lock was thus obviously aware of the defense well before the February 2007 deadline that the court had earlier thought barred the defense. That in turn meant that Lock was not prejudiced when Americare raised the setoff argument more formally. See *Curtis v. Timberlake*, 436 F.3d 709, 711 (7th Cir. 2005) ("[A] delay in asserting an affirmative defense waives the defense only if the plaintiff was harmed as a result."). Once again, the district court enjoys considerable discretion to enforce and administer the case-processing deadlines it sets, and it is also in the best position to assess prejudice from any missed deadline. We see no abuse of discretion

here, and we therefore reject Lock's challenge to the allowance of the setoff.

D

In its capacity as appellant, Americare devotes a great deal of time and energy to attacking the affidavit of Timothy Maher, who is an attorney at the firm of Barnes & Thornburg LLP and who has represented Lock throughout this litigation. Maher's affidavit was submitted on the issue of attorneys' fees, which the lease authorized. Lock also submitted a 286-page billing statement that showed hourly billing rates for attorneys ranging from $165 to $375, and an hourly rate for paralegals ranging from $135 to $150. Americare focuses its criticism on paragraph seven of Maher's affidavit on the ground that it was based on a belief rather than on facts. Here is what the paragraph said:

> Lock was charged standard rates for this litigation. Based on the legal experience, education, and training of the attorneys and paralegals involved and the nature of this case, I believe these standard billable rates are reasonable and customary rates to be charged for people in this area and for the work that was done.

The district court sensibly held that even if the phrasing in paragraph seven could be understood in isolation as a reference only to Maher's beliefs, the affidavit taken as a whole amply demonstrated that Maher had personal knowledge of the facts presented in the affidavit and

was competent to testify to them. His affidavit supported a finding that the rates reflected in the billing sheets were the actual rates charged by the attorneys and paralegals who worked on the case, and that these rates were consistent with market rates in the area. Although the defendants would have been entitled to present evidence to rebut that showing, they did not.

Under these circumstances, the court did not err by concluding that Maher's affidavit was admissible under Federal Rule of Evidence 602, as lay witness testimony on matters about which he has personal knowledge.

E

Finally, Americare urges that the district court abused its discretion when it decided to award fees to Lock, and when it refused to reduce the award in *Lock II* because of Americare's success on the setoff point. Our review of an award of attorneys' fees is deferential for a number of reasons: the district court has a more complete picture of the case as a whole; the issues tend to be factual matters for which appellate review is limited; the accuracy of the ultimate decision is not likely to be enhanced by frequent and detailed appellate review; and it would be wasteful to engage in a "second major litigation" over attorneys' fees. *Pickett v. Sheridan Health Care Ctr.*, 664 F.3d 632, 639 (7th Cir. 2011). Nevertheless, we do rely on the district court to review both the entitlement to fees and the particulars of fee requests carefully and to justify its conclusions.

The district court here did all that and more. It reviewed Lock's billing records for "objective evidence of the nature of legal services and reasonableness of the fee," to ensure consistency with the Indiana Professional Conduct Rules and Indiana law. See *Order for Mandate of Funds Montgomery Cnty. Council v. Milligan,* 873 N.E.2d 1043, 1049 (Ind. 2007). The court then looked at the "lodestar"—the rate charged and the hours worked—and concluded that it was presumptively reasonable. It was at this stage of the analysis that the court took Maher's affidavit into account.

In assessing the need for the number of hours worked, the court took into account Americare's argument that "[t]he use of block billing, inclusion of services that can't be identified as compensable in this case, the lack of detail with respect to the type of services rendered, and overlap between [*Lock I* and *Lock II*] make it impossible to determine whether the amounts claimed . . . were reasonable and necessary." Recognizing these limitations, the court combed through the billing records and struck entries that could not be justified as reasonable and necessary. The court listed nine problematic entries, amounting to $3,103.50, as items that it was disallowing. It then identified another group of entries that added up to $9,917.50, and disallowed them as well. Americare has not pointed to any specific problem with the district court's decisions, nor has it identified any additional items that should have been disallowed. The court had no obligation to respond any further to Americare's global objection to the fee award.

Americare did make one final set of objections, however, all of which relate to the degree of success Lock ultimately achieved. First, Americare asserted that Lock's fees should be reduced to 8% of the requested level because Lock's ultimate judgment was only about 8% of its original claim for $10,000,000. The court rightly noted that there is no authority for that approach under Indiana law. Indeed, under Indiana law, "a trial court abuses its discretion if it reduces an otherwise reasonable fee request based on the amount of the judgment." *Benaugh v. Garner,* 876 N.E.2d 344, 348 (Ind. App. 2007). Americare tries to make it look as if Lock spent some $700,000 in fees to collect a judgment of $244,883.13. But that is not a fair representation of the degree of success Lock had. In *Lock I,* Lock recovered $485,430.56 in damages and secured $117,120.37 (the initial $29,238.85 plus the supplemental $86,675.50 and $1,206.02) in attorneys' fees and costs. In *Lock II,* before the offset Lock won $1,000,281.51 in damages ($371,249.30 + $212,703.96 + $416,328.25); after subtracting the $126,366.71 offset, it still had $873,914.80 to show for its efforts. The *Lock II* fees and costs came to $701,146.64. Combining the amounts Lock won and the cost and fee awards in both cases, we have $1,359,345.36 in damages and $818,267.01 in fees and costs. These numbers do not compel a finding that the district court abused its discretion either in its decision to award fees or in the amount of the fees and costs it selected.

## IV

It is unfortunate that this litigation spun so far out of control. The long delays that punctuated the course of proceedings, even if motivated by hopes of reaching settlement or at least an agreed way to move forward, in the end helped no one. As we said at the outset, the issues before us now represent the end of the line. The district court did not abuse its discretion in the rulings brought before us for review. We therefore AFFIRM the judgments of the district court in all three appeals. Costs are to be taxed against U.S. Health and Americare.